Clanty ST. CLAIRE, Plaintiff,

v.

MINNESOTA HARBOR SERVICE, INC., a Minnesota corporation, Kenneth Hutton and Norman Nerlien, Defendants.

No. 3-62-Civ. 18.

United States District Court
D. Minnesota,
Third Division.

Nov. 1, 1962.

Gilbert J. Schlagel, St. Paul, Minn., for plaintiff.

J. H. Geraghty, St. Paul, Minn., for defendant Minnesota Harbor Service, Inc.

LARSON, District Judge.

This is a tort case and jurisdiction is based on diversity of citizenship and the required amount. The plaintiff allegedly entered the employ of Manpower, Inc. (Manpower) some short time prior to July 21, 1961.

Manpower is a corporation whose general function is to supply personnel as a part of its service to companies which have need for its service and personnel, either on special projects or to fill in a day or so. Manpower made an oral agreement with Minnesota Harbor Service, Inc. (defendant) to furnish personnel to fill in the temporary labor needs of defendant. There has been argument in the briefs and at the hearing as to what the terms of this oral contract were, but it seems clear that it contained at least the following provisions:

1. Manpower was to provide its employees to defendant upon request, at any time.

2. The employees sent to defendant for designated work were to remain the employees of Manpower.

3. All hiring of the employees was to be done by Manpower. Manpower paid the employees, deducted taxes, social security, workman's compensation, filed the bond, selected the man for the job, instructed the man as to where he was to go and the general type of work which he was to do. The only prerequisite was that the laborer be suitable for the work required of him.

4. In consideration for this agreement, defendant would pay Manpower $1.71 per hour per man, and Manpower in turn would pay its own employee.

The plaintiff and defendant make various allegations as to some of the other terms of the oral contract. The relevant allegations will be considered in this opinion and the others will not.

■ The important facts which are not in dispute are that the plaintiff was sent to the defendant to clean a barge on July 21, 1961, that while he was performing the task of cleaning the barge he stopped and assisted some other employees who were engaged in manipulating a large cover with a crane, the cover fell, and the plaintiff was severely injured. Negligence is alleged. The question here is whether the plaintiff is barred from a tort action by virtue of being an "employee" of the defendant insofar as the Workman's Compensation law is concerned. The plaintiff alleges that he was only the employee of Manpower and that the defendant is a third-party tort-feasor which he can sue in tort under the applicable statutes of this State. The defendant alleges that it had full control over the details and manner in which the work of the plaintiff was to be done. The plaintiff (1) denies "control" by the defendant and (2) says that in any event the question is one for the jury. The defendant has moved for a summary judgment under Rule 56.

■ The summary judgment rule says, inter alia, that courts and defendants are not to be burdened with the trying of actions which at the outset can be reasonably considered to be destined for failure. The Courts of Appeal have made it clear that summary judgments are not to be granted readily. On the other hand, courts and defendants are not to be unduly harassed. With these considerations in mind, the question will be approached: Are there any genuine issues of fact and is the defendant entitled to a judgment as a matter of law?

■ At the outset of the plaintiff's brief the following "fact" appears as a term of the oral contract:

"Supervision and control of the employee was to remain with Manpower, Inc. leaving merely the designation of work to Minnesota Harbor Service, Inc."

It is obvious that this is an argumentative statement, but beyond that it seems to draw an extremely fine distinction and this distinction will be considered in more detail later. The plaintiff is trying to get his case to the jury and is not in any way to be criticized for this. However, it would seem that this Court would be better advised to use such technical words as "control" only to state the issues, define the law, and reach the conclusions, lest clear analysis of the facts

be obscured by a smokescreen of semantics. Technical terms are a necessary part of the law, but they cannot be substituted for the facts. And, most important, it must be recalled, Rule 56 is concerned with the *facts*. The whole purpose of the rule is to examine the *factual* allegations of the parties and determine whether there are any genuine issues as to the *facts*.

The law is clear. If the plaintiff was injured within the scope of his employment while he was an "employee" of the defendant, then he is barred by the applicable Workman's Compensation statute from bringing this action. 13 M.S.A. § 176.01 et seq. The Courts of this State have applied the test of "control" to determine whether one person was the "employee" of another. See cases cited in 13 M.S.A. § 176.01 at note 75. "Control" has in fact been recently said to be the most important single factor. Krause v. Trustees of Hamline University of Minn., 243 Minn. 416, 68 N.W.2d 124 (1955). The test, of course, must be applied to the facts, which in this case means that the economic realities underlying the agreement between Manpower and defendant must be ascertained.

The only thing that is clear at the outset is that Manpower was to send personnel to the defendant to do work. In the plaintiff's brief (p. 5) it is said:

"Under the agreement, Manpower, Inc., was to maintain exclusive control over its men, had exclusive right to hire, fire and *regulate the actions of its men,* paid the men, deducted taxes and social security, filed the bond, *instruct the men when and where to go and the type of work to be done* and by agreement maintain the relationship of master and servant between itself and St. Claire." (Emphasis supplied)

This is a bold argument. It should be examined closely. It will be observed that inserted in the details of clerical work which Manpower was to perform is the statement that Manpower had the right to "instruct the men when and where to go and the type of work to be done." and to "regulate the actions of its men." This is a somewhat misleading statement because it might cause the reader to think that it was the business of Manpower which was being performed on the barge and not that of the defendant. The reader might think that Manpower had more interest and concern in the barge than did the defendant. If this impression exists it should be corrected. In this case the plaintiff does not seem to have been told when he left Manpower that he was to go to the defendant and clean barges, but let us assume that he was given very explicit directions as to what to do. Where did these directions come from? Where, in short, did the "control" originate; where did it all start? Now it is certain that Manpower, if it wishes, can hire people and send them places to do things that Manpower would like to see done and that the owners of the property would not object to being done. Is Manpower some sort of a charitable organization like the Red Cross? That has not been argued. Now it is also certain that Manpower, if it wished, can hire people and send them places to do things which it would like to see done even though the owners of the premises objected to it. Is Manpower some sort of an officious intermeddler? That has not been argued. It would thus seem that the impetus of the whole affair—the origin of the idea that certain work needed to be done—the embryo of the "control"—began with defendant and not Manpower.

Plaintiff and other personnel were sent by Manpower to clean barges under the control of the defendant. Manpower just provides temporary help for a fee. Manpower had no interest in the barge. Plaintiff went to the defendant because the defendant needed some temporary help. Manpower was in the business of selling temporary help, and the defendant wanted to buy some. That is why the plaintiff went to the barge on that fateful day, and it seems patently clear that any argument to the contrary would

be met with utter disbelief by a jury. The law is clear; the test is control. The control originated at the defendant. No reasonable jury could find that the plaintiff and his brother were on that barge for any reason save that the defendant had sent for them.

■■■ A description of what happened on the barge appears in the plaintiff's brief (p. 10) and is as follows:

> "Mr. St. Claire had been cleaning the barges and the Minnesota Harbor Service foreman using the crane had been moving covers. Mr. St. Claire was *requested* to give a helping hand to the other employees who were engaged in manipulating a large cover. St. Claire had been cleaning the barge while other employees had been setting the covers and assisting the foreman with the crane. In this instance Mr. St. Claire was *asked* to give a helping hand and it was at this time that the accident occurred. They had not been engaged in the same activity." (Emphasis added.)

It will be observed that the plaintiff has used the words "requested" and "asked" to describe the communication which led the plaintiff to proceed to the fateful task. It may very well be that the plaintiff was "asked" to lift the barge cover, but the question here is whether the defendant could have simply told him to do it without being polite about it. The plaintiff seems well aware that this is the issue, because elsewhere in the plaintiff's brief (p. 6) appears the following statement:

> "The relation of master and servant is a contractual one. A contract may be expressed or implied, but there must be a contract in order to create the relationship. Dahl v. Wunderlich, 194 Minn. 35, 259 N.W. 399. A new master cannot be foisted upon a servant unwittingly. The right to select one's employer is implicit in freedom from involuntary servitude. An employer may loan his employee to another so that for the time being the employee becomes the servant of the latter, but this can be done only with the employee's consent. Melhus v. Sam Johnson & Sons Fisheries Co., 188 Minn. 304, 247 N.W. 2."

This seems an accurate statement of law, and it should be kept in mind in the following discussion. The plaintiff's brief also cites the case of Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614 (1951) and has emphasized the following words among others:

> "The orders of the borrowing employer must be *commands* and not *requests* if the worker is to be found to be a loaned servant." (Different emphasis supplied by this Court).

The words of command and request call to mind an example which will illustrate the difference between the two words in a situation of this sort. It is dangerous to hypothesize, but let us first assume that when this plaintiff went to defendant from Manpower, defendant thought that the plaintiff was an ordinary manual laborer. Without meaning to demean the plaintiff, his wage rate of $1.05 per hour would indicate that defendant thought that he was only capable of doing ordinary work *and that their agreement was that Manpower was only selling the efforts of an ordinary laborer.* Now let us suppose that when the plaintiff arrived at the barge in question casual conversation brought out the fact that he was capable of operating a welding machine which required a high degree of skill. Could defendant have commanded the plaintiff to work for several hours at work for which defendant would otherwise perhaps have to pay an hourly wage of four dollars? It would seem not. As the plaintiff points out in one of the previously quoted statements, "The right to select one's employer is implicit in freedom from involuntary servitude." The relevance of that statement here is that by coming to the barge and starting to clean it, the plaintiff—in the eyes of the law—had selected his ultimate employer (the defendant) and the job which he would do (ordinary labor). His freedom to resist orders to do any high-skill

welding is manifest from his agreement to receive only $1.05 per hour. He would not have to do the welding because, as he points out, this country enjoys freedom from involuntary servitude.

It would seem that the defendant in this hypothetical would have two alternative courses of action if it wished to get the welding done. It perhaps could call Manpower, tell Manpower the situation, make a new contract with Manpower, have Manpower make a new contract with the plaintiff, and then "command" the plaintiff to do the welding. The other alternative would be to "request" the plaintiff to do the $4 per hour welding for his $1.05 wage. Assume in the latter case that the welding machine exploded as a proximate cause of the negligence of defendant. Could the plaintiff then have sued defendant as a third-party tort-feasor? The case is not before this Court, but it seems that he *might* recover because defendant could not have "commanded" him to do the welding but could only "request" it. There is quite some difference in laying down a broom and picking up a welding machine. The latter task calls for a skill that the parties to the contract did not contemplate that the plaintiff had and that he was not obligated to perform. It is something else to simply lay down a broom or a shovel or whatever was being used and pick up a barge cover. Both tasks seem to call for the same level of skill that Manpower was selling to defendant for the gross rate of $1.71 per hour. The agreement of the parties—which has been so vigorously pressed upon this Court—would seem to give defendant the right to command the plaintiff to pick up a barge cover as well as to push a broom. It has not been argued here that defendant, prior to ordering the plaintiff to pick up this cover, should have stopped and asked Manpower for permission. It seems to this Court that most if not all businessmen in the situation of defendant would have assumed that an employee who is receiving a wage of $1.05 per hour could be commanded to pick up a barge cover as well as push a broom. The converse of this proposition is that the defendant did not have to "request" (to use the legal conclusion word) the plaintiff to pick up the barge cover. The reason is that both tasks involve manual labor and manual labor is what the defendant was buying and what the plaintiff was selling, with Manpower as a mere agency to facilitate the transaction by performing all the clerical tasks previously mentioned. Therefore it seems that the defendant had the right to tell the plaintiff to help with the barge cover and the plain truth of the matter is that the plaintiff did do as he was told. There has not been a murmur of argument in this case in support of the proposition that the plaintiff did not have to do as he was "requested." All the facts are to the contrary. The deposition of the plaintiff was as follows: (p. 11):

"Q. Was the work that you did limited to any special type of work or what?

"A. Not that I know of. I imagine it was what you might call just general labor."

This question was, of course, put by the counsel for the defense, but later in the deposition the following questions were put by the plaintiff's counsel (pp. 54–55):

"Q. Mr. St. Claire, this work that you were doing, this was just the second day that you were there? Isn't that right?

"A. Yes.

"Q. For purposes of clarification, this was casual labor. Is that right?"

This question came at the end of the deposition and the reporter apparently missed the answer, but there can be little doubt as to the answer to this question phrased by the plaintiff's own counsel. It is patently clear that the plaintiff was merely an ordinary laborer. The plaintiff's statements about the defendant "requesting" and "asking" the plaintiff to lift this barge cover are not only unsustainable from a legal point of view, but are sadly undermined by the plain-

tiff's deposition, which shows almost conclusively that the plaintiff thought that he *had* to help with that barge cover. (p. 11).

"Q. Now at the time of the accident, what were you specifically doing?

"A. Well, I had went down to get a drink of water and when I come back up, I mean, they had this one lid already set and they were moving this other lid in and I had come up and I stood on the fender and *Mr. Hutton says to me, he said, 'Get up there and help put that cover into place, help guide this cover into place,'* and my brother was already up there. So he was on this side, *so I stepped over. I* don't know if you call this north or south, whichever way it is (indicating), but I was on the other side of my brother at the time. When they were dropping this lid into place, I don't know what happened, if the winch slipped or what, but the lid went down into the hold and it come back up and it kicked the one we were standing on (indicating)." (Emphasis supplied).

Almost the same words were used by the plaintiff later in the deposition. (pp. 31–32):

"Q. Now this cover or just before you fell or the accident happened, could you describe in your own words what happened?

"A. The only thing I can—

"Q. Excuse me before you start, take it from the time when Mr. Hutton told you to go up and help put that cover into place?

"A. Well, I had went down and got a drink of water and I come back up and I was standing on the fender and *he says,*

*'Get up there and help guide that lid into place.'* So my brother was standing, I would say, on the righthand side of the barge and Norm was bringing this lid into place." (Emphasis supplied).

All that has been said shows that the plaintiff was injured within the scope of his employment while under the "control" of the defendant and no reasonable jury could find otherwise. It follows that the plaintiff is barred from bringing a negligence action against defendant. The reason is that—for purposes of the Workman's Compensation law—defendant was the employer of the plaintiff. Defendant had control of the plaintiff in the circumstances present here and had the right to command the plaintiff to lift the barge cover.

The essence of the matter is that the plaintiff is trying to get his Workman's Compensation from one employer and a tort recovery from someone else allegedly outside the employment relationship. The plaintiff here is trying to say that a person can only have one employer. The plaintiff here had two employers, but they performed different functions. Manpower solicited the employees in the first instance, kept the books, and did all the clerical work. To use a figure of speech, Manpower was manufacturing a commodity, which in this case was manual labor free from the need for clerical service. Manpower sold the manual labor to the defendant, which used it to perform tasks normally accomplished by manual labor. The plaintiff is trying to describe this situation as one in which there were two parties present when he got hurt—his employer and a third-party tort-feasor. But the depositions of the plaintiff showed what common sense would have suggested: No one from Manpower ever accompanied the plaintiff or his brother to the barge site. The following questions were asked the plaintiff, p. 13:

"Q. Did your brother go with you that day?

"A. Yes. He worked with me both days.

"Q. Did anyone else go with you that day?

"A. No. Just my brother and myself."

An earlier question was to the same effect, p. 11:

"Q. Did anyone from Manpower ever go with you?

"A. No. How do you mean that, the executive.

"Q. Did anybody ever go with you to see that you were doing the work properly?

"A. No, sir.

"Q. They would just send you over to the company and they would sort of take over then and you would work for the given day? Is that correct?

"A. That's true."

Later in the deposition the plaintiff was asked, p. 14:

"Q. Did anyone from Manpower go over with you that day to supervise your work?

"A. No, sir."

Further in the deposition the plaintiff was asked, p. 41:

"Q. Was your brother helping guide this cover in?

"A. Yes, he was with me on the same lid.

"Q. Was anyone else beside you and your brother doing that?

"A. There was two more. Like I said, I know Dick was on one end.

"Q. So there was one guy on each corner of the cover? Is that right?

"A. Yes.

"Q. *Now you took all of your orders from Hutton and the people for Minnesota Harbor Service? Is that right?*

"A. *That's true.*" (Emphasis supplied.)

These facts must be compared with the plaintiff's brief which is as follows:

### "FACTS

" * * * The agreement was oral but its provisions are relatively clear. * * *

"3. Supervision and control of the employee was to remain with Manpower. Inc. leaving merely the designation of the work to Minnesota Harbor Service, Inc. * * *

"5. *From all standpoints* the employee was to remain the employee of Manpower, Inc. * * *

"8. *Manpower, Inc. was to have the full and final control over the employee.*" (Emphasis supplied.)

It is enough to say that this bold argument is demolished by the plaintiff's own words in the above deposition.

It is plain that there was no "third party" present where the plaintiff got hurt; the only "person" there was the "employer"—the defendant, as represented by its agents and employees. The plaintiff was the employee of Manpower —and that has never been disputed—but he was also the "employee" of the defendant insofar as this case is concerned, i. e., for the purposes of the Workman's Compensation law. The simple three-party relationship presented here should not be hard to understand. In addition, it should not be distorted and confused by talk of "supervision and control" on the one hand and "designation of work" on the other. The facts simply do not afford a basis for the use of such terminology. It is conceded that Manpower hires these people. It is conceded that Manpower can refuse to employ them on subsequent occasions and in that sense it can fire them. But could Manpower leave its downtown office, go onto the barge being cleaned by the defendant and tell plaintiff and his brother or others like them to lay down their brooms because Manpower was firing them? Manpower per-

haps *could* do this, but it is a cold and hard fact that defendant would certainly view this type of conduct with a jaundiced eye and probably would never again seek the services of Manpower. Now there is nothing in the record to support the proposition that Manpower is in business to make a profit, but the contrary has not been argued. Would it be consistent with the profit motive for Manpower to follow these people out to the barge being cleaned by the defendant and stand around and make comments as to how Manpower thought the personnel should be directed to clean the barge? Would defendant look kindly on such advice? Would the defendant ever call Manpower again? Not likely. *Manpower is not a management consultant;* Manpower sells labor with the clerical tasks already performed.

This brings up the final and most damning fact. What do the defendant and others who use the services of Manpower get when they buy the commodity that Manpower is selling? In this case the plaintiff received a wage of $1.05 per hour but defendant had to pay $1.71 per hour to get the plaintiff from Manpower. What did the defendant pay that $0.66 differential for? It is a plain fact that the defendant did not get any brooms pushed for that money. What did defendant pay for? Were they enticed to pay this extra money because the salesman from Manpower had a good personality? Not likely! The facts are clear. Defendant has alleged that Manpower had Workman's Compensation in force at the time this accident occurred. Not only was this fact not denied, but it was admitted in open court that the plaintiff has in fact been receiving this compensation. In order for Manpower to have this accident insurance it had to pay a premium. Where did the money to pay this premium come from? Manpower takes in money from only one source—the employers who use its services. Emerging from the confusion caused by the "borrowed servant" and "common purpose" doctrines one fact is becoming clear: There is more than a

vague connection between the extra $0.66 per hour paid by defendant and the Workman's Compensation which this unfortunate plaintiff received. Part of that $0.66 per hour will pay someone's premium, and in the eyes of the law it must be deemed to have paid the premium for this plaintiff. In other words, *the plaintiff is suing in tort the man who paid for his Workman's Compensation.* The defendant paid part of this extra $0.66 per hour for the sole and express purpose of assuring that employees which Manpower sent over for temporary employment would be covered by Workman's Compensation. The defendant paid part of this extra $0.66 per hour for the sole and express purpose of not having to defend actions such as the one which has been brought here. This case strikes at the heart of the Workman's Compensation law; this case is in unequivocal opposition to the well-known principles on which Workman's Compensation is founded.

It is therefore the opinion of this Court that where the primary employer (Manpower here) does no more than provide personnel for the use of the ultimate employer (the defendant here), where the fees received by the primary employer from the ultimate employer include provision for Workman's Compensation coverage for the employees supplied, where this Workman's Compensation was in force at the time of the accident, and where the injury occurred (1) while the employee was under the control of the ultimate employer (the defendant here) and (2) while the employee was engaged in a task which all the parties (the plaintiff, the defendant and Manpower) must be deemed to have contemplated that the employee would perform (i. e., while the plaintiff was within the scope of his employment), then the injured employee cannot sue the ultimate employer as a third-party tort-feasor.

In this case that means that the defendant is entitled to a summary judgment, for there are no genuine issues as to the *facts.*

A word should be said about some of the terminology which has been employed in arguing this case. The terms "borrowed servant" and "common purpose" have been used, among others. These rules are not the basic law in this case. This case involves a statute, 13 M.S.A. § 176.01 et seq., the terms of which are familiar to the profession. These other rules are merely aids to interpreting and applying the statute. It is the statute which *must* be applied to the facts. These rules *can* be applied if the facts warrant·it. A word should be said about the rules themselves. They are not of recent vintage. They grew up in a long-gone era. This Court notes that the Minnesota Supreme Court, to which this Court must look for guidance in this matter, has said some rather uncomplimentary things about the "loaned servant" rule. Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614, 619–620 (1951). It is, of course, obvious that if the "loaned servant" and the "common purpose" doctrines are to be placed in a legal mausoleum, it is the Minnesota Supreme Court which must administer the final rites. But it is equally certain that those senior citizens of the law have no application to this case. No "servants" were "borrowed" here. The defendant and Manpower had no "common purpose," save only for each to make a profit in performing separate and distinct functions. The Minnesota Court has recognized and adverted to the simple reality of life that two employers can have different types of "control" over an employee. Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614, 620–621, at n. 11 (1951). Most of the problems in this area were ably discussed in that case and need not be repeated here. There have certainly been some complicated cases in this area, but this is not one of them. There were two types of businesses, two types of "employers," and two types of "control," but there was only one "employer" in "control" when the plaintiff was injured within the scope of what was obviously intended to be his only real employment. To use a slogan and add more confusion to the law,' it was only the defendant "whose business" was being done when the plaintiff was hurt. See Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614, 620 at n. 7 (1951). To urge upon this Court that there was or was not a "borrowed servant" or a "common purpose" in this case is to defy the economic reality of this simple commercial transaction.

The plaintiff appears to have sustained severe injuries. It may be that the compensation provided plaintiff by the Workman's Compensation law is not adequate. This problem, however, is not for the Court but for the Legislature.

As stated in the Order, the motion by defendant for Summary Judgment is granted.