USA WASTE OF MARYLAND, INC., Appellant,

v.

Isaac Anthony LOVE, Appellee.

No. 05–CV–1183.

District of Columbia Court of Appeals.

Argued Nov. 7, 2006.

Decided Aug. 21, 2008.

---

William J. Carter, with whom Dennis J. Quinn, Washington, Tamara B. Goorevitz, and David A. Skomba were on the brief, for appellant.

Marc I. Fiedler, with whom Roger C. Johnson was on the brief, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and STEADMAN, Senior Judge.

GLICKMAN, Associate Judge:

The dispositive issue in this appeal is whether an employee of a temporary labor services company is also an employee, for purposes of workers' compensation law, of the business entity to which he is assigned to work. Appellee Isaac Anthony Love was detailed by Ready Staffing, Inc. ("Ready Staffing") to work as a truck driver's assistant for appellant USA Waste of Maryland, Inc. ("USA Waste"), a Maryland trash collection company. Love was seriously injured on the job and brought a personal injury action against USA Waste in Superior Court. In pretrial motions and at trial, USA Waste contended that, as one of Love's employers, it was immune from tort liability to him. The trial judge rejected this defense, ultimately ruling as a legal matter that USA Waste was not Love's employer under District of Columbia law. At trial, the jury returned a verdict in Love's favor and awarded him

damages of $1,335,938.56. USA Waste has appealed.

We hold that Love was USA Waste's employee within the meaning of workers' compensation law.[1] USA Waste therefore is immune from tort liability to Love, and is entitled to judgment as a matter of law.

## I.

There is no dispute as to the material facts. At the time of his accident, Isaac Love had been employed for approximately ten years by Ready Staffing, a temporary labor supply company located in the District of Columbia. To obtain work, Love reported to Ready Staffing's employee lounge early each morning and waited to be assigned a job that day with one of Ready Staffing's clients. Ready Staffing decided where to assign him and transported him by van to and from the job site. As a general unskilled laborer, Love was available to perform construction and trash-hauling jobs throughout the metropolitan area.

USA Waste was one of Ready Staffing's trash-hauling clients to which Love often was detailed to work. At trial, Love estimated he had worked for USA Waste in Maryland on seventy-five to one hundred occasions prior to the date of his accident. He acknowledged that he "chose" to work for USA Waste of his "own free will." [2] While on such assignments, Love was supervised solely by USA Waste. The agreement between the two companies, which was set forth on the back of Love's time sheet, stated explicitly that "Ready Staffing does not provide supervision of Ready Staffing employees while on Customer's premises or job-site." USA Waste also decided how many hours Love worked. Love was subject to USA Waste's rules and discipline, and the company was free to refuse his services.

The companies' agreement specified that Ready Staffing assigned Love to USA Waste "to render temporary service" only. USA Waste agreed that it would not "hire" him or otherwise "interfere with" his employment relationship with Ready Staffing. USA Waste also agreed not to pay Love directly.[3] Instead, USA Waste paid Ready Staffing a fixed hourly rate for Love's services, and Ready Staffing in turn paid Love. Ready Staffing compensated him, at

---

1. *See Union Light & Power Co. v. District of Columbia Dep't of Employment Servs.*, 796 A.2d 665, 669 (D.C.2002) (holding that temporary employee status for workers' compensation purposes is determinable "as a matter of law where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact") (quoting *Thompson v. Grumman Aerospace Corp.*, 78 N.Y.2d 553, 578 N.Y.S.2d 106, 585 N.E.2d 355, 357 (1991)).

2. The testimony, elicited on cross-examination without objection, was as follows:

    Q. And certainly in working for Waste Management [USA Waste], you were there of your own free will. You chose to come to work for Waste Management; is that correct?

    A. Yes.

3. The agreement stated as follows:

    Customer understands Ready Staffing's employees are assigned to Customer to render temporary service. Customer acknowledges the considerable expense incurred by Ready Staffing to advertise, recruit, evaluate, train and ensure the quality of its employees. Therefore, Customer will not, without the written consent of Ready Staffing, hire a Ready Staffing employee, interfere with the employment relationship between Ready Staffing and its employees, or directly or indirectly cause a Ready Staffing employee to transfer to another staffing service. Customer agrees that if Customer hires a Ready Staffing employee before the employee has worked 320 hours for Customer, Customer will pay Ready Staffing $600. Customer shall not pay Ready Staffing employees directly or advance any funds to them.

minimum wage, only for the hours he worked for USA Waste (or another customer), and not for the hours he spent waiting at Ready Staffing or in transit between Ready Staffing and the job. The difference between what USA Waste paid Ready Staffing and what Ready Staffing paid Love covered payroll taxes, workers' compensation insurance coverage and other benefits, overhead costs, and Ready Staffing's profit.[4] While Love was covered by Ready Staffing's workers' compensation insurance policy, he was covered by USA Waste's policy as well, even though USA Waste's agreement with Ready Staffing did not require it to furnish such coverage.

In accordance with the foregoing arrangements, Ready Staffing assigned Love to work for USA Waste on January 11, 2002. Love accepted the assignment. The Ready Staffing van transported him and several other temporary employees to USA Waste's facility in Gaithersburg, Maryland, where a USA Waste supervisor assigned Love to work as a driver's helper on a residential trash collection route in Bethesda, Maryland. The driver of the garbage truck, a USA Waste employee named Adisa Harkless, was responsible for Love's performance and safety on the route.

Harkless and Love had been collecting trash for approximately an hour when the accident happened. According to Love's account, he was attempting to climb aboard the truck when Harkless unexpectedly released the emergency brake and stepped on the accelerator. The truck lurched forward. Love lost his footing and fell to the pavement. Before he could recover, the truck's left front tire rolled over his right leg. The severely damaged limb could not be saved and was amputated above the knee.

Pursuant to the District of Columbia Workers' Compensation Act, Love applied for and received benefits covering lost wages, medical expenses and vocational rehabilitation from Ready Staffing and its insurer. He did not seek any such benefits from USA Waste. Instead, he sued USA Waste for negligence in Superior Court.

## II.

As a threshold matter, the parties disagree over whether USA Waste's claimed immunity from tort liability is governed by the workers' compensation law of Maryland or the District of Columbia. The parties focus their disagreement on the choice of law principles we have adopted in the District of Columbia for tort cases in general. In such cases, we have held, the choice of law turns on which jurisdiction has "the most significant relationship to the dispute,"[5] and "which jurisdiction's policy would be more advanced"

---

4. The agreement between Ready Staffing and USA Waste provided that "Ready Staffing reserves the sole right to establish the wages and fringe benefits, if any, of its employees, and assumes responsibility for the payment of such compensation, the withholding and payment of all required payroll taxes, and the compliance with state laws requiring worker's compensation and other statuary [*sic*] benefits, except where obligations are specifically imposed by law."

5. *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C.1995). To identify the jurisdiction with the most significant relationship to the dispute, we consider four factors:

    a) the place where the injury occurred;
    b) the place where the conduct causing the injury occurred;
    c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
    d) the place where the relationship is centered.

*Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971)).

by applying its law.[6] The trial court agreed with Love that those metrics call for application of D.C. law to the instant dispute,[7] while USA Waste argues for the application of Maryland law.[8]

However, a special choice-of-law rule applies in this jurisdiction to claims of immunity under workers' compensation laws.[9] The essence of the rule is set forth in the Restatement (Second) of Conflict of Laws as follows:

> § 184   Abolition of Right of Action for Tort or Wrongful Death Recovery for tort or wrongful death will not be permitted in any state if the defendant is declared immune from such liability by the workmen's compensation statute of a state under which the defendant is required to provide insurance against the particular risk and under which
>
> (a) the plaintiff has obtained an award for the injury, or
>
> (b) the plaintiff could obtain an award for the injury, if this is the state (1) where the injury occurred, or (2) where employment is principally located, or (3) where the employer supervised the employee's activities from a place of business in the state, or (4) whose local law

governs the contract of employment under the rules of §§ 187–188 and 196.[10]

The rationale of this choice-of-law rule is to foster the fundamental policies of workers' compensation laws, to which all states and the District of Columbia subscribe:

> It is thought unfair that a person who is required to provide insurance against a risk under the workmen's compensation statute of one state which gives him immunity from liability for tort or wrongful death should not enjoy that immunity in a suit brought in other states. Also to deny a person the immunity granted him by a workmen's compensation statute of a given state would frustrate the efforts of that state to restrict the cost of industrial accidents and to afford a fair basis for predicting what these costs will be. All states are sympathetic with the policies underlying workmen's compensation, and all states grant certain persons immunity from liability for tort or wrongful death, although the provisions of the various statutes do differ in matters of detail. For all of these reasons, a state will not hold a person liable for tort or wrongful death under the circumstances stated in the present rule.[11]

---

6. *Id.* The jurisdiction with the most significant relationship to the dispute is "presumptively ... the jurisdiction whose policy would be more advanced by application of its law." *Drs. Groover, Christie & Merritt, P.C. v. Burke,* 917 A.2d 1110, 1117 (D.C.2007); *see also Hercules & Co. v. Shama Rest. Corp.,* 566 A.2d 31, 41 n. 18 (D.C.1989).

7. Among other things, Love argues that the District of Columbia is where he resides and where, through Ready Staffing, his relationship with USA Waste was centered.

8. USA Waste argues that Maryland is where Love was injured; where the conduct causing his injury occurred; where USA Waste is incorporated and does business; and where it exclusively utilized Love's services.

9. *See Jonathan Woodner Co. v. Mather,* 93 U.S.App. D.C. 234, 239–40, 210 F.2d 868, 873–74 (1954) ("[I]n an employee-employer suit, if some workmen's compensation act purports to bar the action, that bar will be applied in the forum."); *see also Dominion Caisson Corp. v. Clark,* 614 A.2d 529, 532 (D.C.1992) (recognizing continuing applicability of *Jonathan Woodner* where defendant was plaintiff's "statutory employer" obligated to provide workers' compensation coverage under another jurisdiction's law).

10. Restatement (Second) of Conflict of Laws § 184 (1971).

11. *Id.* cmt. b; *see also Dominion Caisson, supra* note 9, 614 A.2d at 532 (quoting *Jonathan Woodner,* 93 U.S.App. D.C. at 239–40, 210 F.2d at 873–74).

Love was injured in Maryland. Consequently, under Section 184(b)(1), if Maryland's workers' compensation law would bar his negligence action against USA Waste, we must enforce that bar even if District of Columbia law would permit the action to proceed. That said, we conclude there is no conflict of laws that must be resolved by resort to a choice of law rule. A conflict of laws does not exist when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented.[12] As we shall now discuss, that is the case here. Under the so-called "lent employee" doctrine, which is a feature of both Maryland and District of Columbia workers' compensation law, an employer such as USA Waste is immune from tort liability to a temporary worker such as Love.

## III.

■ The "philosophy" of workers' compensation law "has commonly been described as a *quid pro quo* on both sides: in return for the purchase of insurance against job-related injuries, the employer receives tort immunity; in return for giving up the right to sue the employer, the employee receives swift and sure bene-

fits."[13] Thus, the workers' compensation statutes of Maryland and the District of Columbia afford immunity to employers from tort actions by their employees for personal injuries arising out of and in the course of their employment.[14] Consequently, we consider whether USA Waste was Love's employer at the time of the accident under the substantive principles of each jurisdiction's workers' compensation law.[15] If so, then USA Waste (which complied with any statutory obligation it had to secure coverage as a condition of immunity) is immune from tort liability to Love, regardless of which jurisdiction's law might be said to apply.

■ The fact that Love was an employee of Ready Staffing does not preclude his being deemed an employee of USA Waste as well. Under the workers' compensation laws of Maryland and the District of Columbia, a worker may have more than one employer at the same time.[16] In that case, both employers are obligated to provide the employee with workers' compensation coverage.

The Maryland Court of Appeals addressed the issue we now confront in

---

**12.** *See Greaves v. State Farm Ins. Co.*, 984 F.Supp. 12, 14 (D.D.C.1997).

**13.** *Meiggs v. Associated Builders, Inc.*, 545 A.2d 631, 637 (D.C.1988).

**14.** *See* Md.Code Ann., Lab. & Empl. § 9–509(a), (b) (1999) ("Except as otherwise provided in this title, the liability of an employer under this title is exclusive . . . . [and] the compensation provided under this title to a covered employee or the dependents of a covered employee is in place of any right of action against any person."); D.C.Code § 32–1504(b) (2001) ("The compensation to which an employee is entitled under this chapter shall constitute the employee's exclusive remedy against the employer . . . for any illness, injury, or death arising out of and in the course of his employment. . . .").

**15.** In positing, for the sake of argument, that choice-of-law principles might favor effectuating the policies of either Maryland or District of Columbia law in this case, we disregard the normal geographical limitations of those laws and focus only on their substantive principles.

**16.** *See Mackall v. Zayre Corp.*, 293 Md. 221, 443 A.2d 98, 102 (1982) ("This Court has repeatedly recognized that, under certain circumstances, a person performing a given function simultaneously may be the employee of two employers.") (citations omitted); *Union Light, supra* note 1, 796 A.2d at 669–71 (discussing different types of dual employment under District of Columbia law).

*Whitehead v. Safway Steel Products, Inc.*[17] The facts of that case are comparable to those here. Bay Services, Inc. ("Bay"), like Ready Staffing, was "a temporary help agency in the business of supplying unskilled labor to various industrial customers."[18] The temporary workers were Bay's employees, and Bay could fire them if their performance on an assigned job was unsatisfactory.[19] When a client requested assistance, Bay would "select[ ] an employee from among its available labor pool and assign[ ] the worker to the job. The client [was] then free to utilize and direct the employee as the particular situation demand[ed]."[20] Bay billed its clients for the hours its assigned employees worked, and in turn paid them "a designated wage."[21] Bay also maintained workers' compensation insurance coverage and paid unemployment insurance assessments for its employees.

Bay assigned one of its employees, Sidney Whitehead, to Safway Steel Products, Inc. ("Safway"). The second day on the job, Whitehead was injured while loading steel scaffolding. He received workers' compensation benefits through Bay and brought a negligence lawsuit against Safway. Safway, like USA Waste here, moved for judgment as a matter of law, contending that Whitehead was its employee and that his exclusive remedy, therefore, was under the workers' compensation statute. The trial court ultimately granted judgment to Safway on that ground, notwithstanding a jury verdict in Whitehead's favor. The Maryland Court of Appeals affirmed, holding as a matter of law that "a person who is employed by a temporary services agency is also an employee of the company to which the worker is provisionally assigned."[22]

In reaching this conclusion, the Court first determined that Safway, not Bay, controlled and directed Whitehead in the performance of the work and the manner in which it was to be done—the traditional test of an employer/employee relationship under the common law in Maryland.[23] Specifically,

> Safway instructed Whitehead on the task to be performed, supervised his work, and was free to reassign him to any other duties that warranted attention. If Whitehead's work was unsatisfactory, Safway was free to dismiss him and request an additional worker.[24]

Additionally, the Court noted, though Whitehead received his paycheck from Bay, it was Safway (along with Bay's other clients) that ultimately paid his wages and benefits—including, notably, the premiums for his insurance coverage:

> [T]he amount Safway was billed by Bay for its use of the temporary worker was greater than what Bay paid Whitehead. This extra cost doubtlessly helped cover, besides Bay's profit margin, such expenses as Bay's payment of Whitehead's unemployment and workmen's compensation insurance. In other words, Safway actually contributed to the insurance protection of one of its employees.[25]

17. 304 Md. 67, 497 A.2d 803, 805 (1985).

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.*

22. *Id.*

23. *Id.* at 809 (citing, *inter alia, Mackall,* 443 A.2d at 103).

24. *Id.*

25. *Id.* While Bay retained "the actual authority to hire and fire Whitehead," the Court deemed it more important that "Safway retained the power to control [him] while he was in its employ." *Id.* at 811, 443 A.2d 98.

Further, the Court concluded, Whitehead was Safway's employee under the "lent employee" doctrine, "which specifically envisions situations identical to the one at bar."[26] Quoting Larson's treatise on workers' compensation, the Court set forth the elements of the doctrine as follows:

> When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if
>
> (a) the employee has made a contract of hire, express or implied, with the special employer;
>
> (b) the work being done is essentially that of the special employer; and
>
> (c) the special employer has the right to control the details of the work.
>
> When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.[27]

An implied contract of hire between Safway and Whitehead existed, the Court held, because Whitehead clearly "consent[ed] to the special employment relationship."[28] As the Court explained:

> There can be little doubt in the instant case that Whitehead consented to

work for Safway. The contract between Whitehead and Bay specifically informed the worker that he would be assigned to client locations. Before accepting assignment, Whitehead was apprised of the customer's name and address and the nature of the work. Whitehead could decline assignment, if he chose, without fear of reprisal. Whitehead voluntarily reported, on two separate occasions, to the Safway plant, and submitted to the special employer's direction and control. All of these factors satisfy element (a).[29]

The second and third requirements of the "lent employee" doctrine were met as well, the Court stated, because "the tasks performed by Whitehead at Safway were exclusively that of the special employer," which—as the Court previously found—had "control over the details of [the] work."[30]

As the Maryland Court of Appeals noted, numerous other courts have reasoned similarly and held employees of temporary labor agencies to be employees as well of the client businesses to which they are assigned for workers' compensation purposes.[31] Although we have not previously

---

"[T]he power to hire or discharge a worker can be vested in one person and the power of control in another, and ... in such a case the person having the power of control is the master." *Id.* (citation omitted).

**26.** *Id.*

**27.** *Id.* (quoting 1C LARSON, WORKMEN'S COMPENSATION LAW § 48.00 (1982 ed.)). The same test is set forth in 3 LARSON'S WORKERS' COMPENSATION LAW § 67.01 (2008 ed.) (hereinafter referred to as "LARSON"). The terms "general employer" and "special employer" refer to the lending employer and the borrowing employer, respectively. *See id.*

**28.** *Id.* at 812, 443 A.2d 98.

**29.** *Id.* (citations omitted).

**30.** *Id.*

**31.** *Id.* at 809–10, citing *Simmons v. Atlas Vac Machine Co.*, 493 F.Supp. 1082 (E.D.Wisc.1980); *Rumsey v. Eastern Distribution, Inc.*, 445 So.2d 1085 (Fla.Dist.Ct.App. 1984); *Hoffman v. Nat'l Mach. Co.*, 113 Mich. App. 66, 317 N.W.2d 289 (1982); *Fox v. Contract Beverage Packers, Inc.*, 398 N.E.2d 709 (Ind.Ct.App.1980); *Danek v. Meldrum Mfg. & Eng'g Co.*, 312 Minn. 404, 252 N.W.2d 255 (1977); *English v. Lehigh County Auth.*, 286 Pa.Super. 312, 428 A.2d 1343 (1981). *See also, e.g., Maynard v. Kenova Chem. Co.*, 626 F.2d 359 (4th Cir.1980); *Beaver v. Jacuzzi Bros., Inc.*, 454 F.2d 284 (8th Cir.1972); *Bliss v. Ernst Home Center, Inc.*, 866 F.Supp. 1362 (N.D.Utah 1995); *St. Claire v. Minnesota Harbor Serv., Inc.*, 211 F.Supp. 521 (D.Minn. 1962); *Booher v. Pepperidge Farm, Inc.*, 468

decided the precise question in the District of Columbia, we have recognized the "lent employee" doctrine utilized in *Whitehead* to be a basis for finding dual employment under the District's workers' compensation law.[32] In applying that doctrine, *Whitehead* and the other cases are persuasive authority, and we see no reason to deviate from them. We therefore turn to consider whether Love's relationship with USA Waste met the requirements of the "lent employee" doctrine, as it has been described in both Maryland and the District of Columbia.

There is no doubt that the relationship between USA Waste and Love satisfied the second and third elements of the doctrine. The work Love performed as a trash collector was "essentially that of the second employer," USA Waste; and USA Waste "ha[d] the right to [and did] control the details of the work," including the collection routes to be followed, the hours worked, the equipment used, and the specific manner of performance. Indeed, Love was indistinguishable from a regular employee of USA Waste doing the same work.

The dispute is over the first element, the requirement of "a contract of hire, express or implied." There was no express contract between Love and USA Waste. But we think "the conduct of the parties in the milieu in which they dealt"[33] demonstrates unequivocally that an implied contract of hire existed between them.[34] Love knowingly and voluntarily accepted his assignment to work for USA Waste and under its supervision, and his continuing consent is implied by his continuing submission to that company's control and direction.[35] "[W]hat is important is not subjective consent, but rather an objectively manifested consent to the employment relationship as that relationship is understood by the

So.2d 985 (Fla.1985); *Farrell v. Dearborn Mfg. Co.* 416 Mich. 267, 330 N.W.2d 397 (1982); *Daniels v. Pamida, Inc.,* 251 Neb. 921, 561 N.W.2d 568 (1997); *Adams v. North–Star Constr. Co.,* 249 A.D.2d 1001, 672 N.Y.S.2d 166 (1998). *See generally* LARSON § 67.05[3].

**32.** *See Union Light, supra* note 1, 796 A.2d at 667 n. 3, 669 (quoting LARSON § 67.01[1] ).

**33.** *Id.* at 669 n. 6 (internal quotation marks and citation omitted).

**34.** *See id.* at 669–70. This also satisfies the general definition of "employee" in the District of Columbia Workers' Compensation Act, which encompasses almost anyone "in the service of another under any contract of hire or apprenticeship, written or implied, in the District of Columbia." D.C.CODE § 32–1501(9) (2001). As no claim is or could be made that Love was an independent contractor, we need not pause to apply the "relative nature of work" test utilized in this jurisdiction to distinguish an employer/employee relationship from an independent contractor relationship. *See Gross v. District of Columbia*

*Dep't of Employment Servs.,* 826 A.2d 393, 396 (D.C.2003); *Munson v. District of Columbia Dep't of Employment Servs.,* 721 A.2d 623, 625–27 (D.C.1998).

**35.** *See* LARSON § 67.02[3]; *Union Light, supra* note 1, 796 A.2d at 670. In *Whitehead,* the Maryland Court of Appeals mentioned that the employee "could decline assignment, if he chose, without fear of reprisal." 497 A.2d at 812. That raises the question whether the "lent employee" doctrine is satisfied if the employee could be fired (or otherwise disciplined) for refusing an assignment. We have some doubt that such a possible consequence would be enough by itself to render the temporary work relationship non-consensual for these purposes. In the present case, the record does not make entirely clear whether Ready Staffing could have fired Love had he declined his assignment to USA Waste, but Love does not dispute USA Waste's assertion in its brief that he would not have been penalized. Given Love's express acknowledgment at trial that he worked for USA Waste of his "own free will," and the absence of any evidence or argument that he was coerced into doing so, we think the necessary consent was shown.

workers' compensation statute." [36] For its part, of course, USA Waste agreed to utilize and supervise Love, exactly as if he were one of its regular employees. And in exchange for his services to USA Waste, Love had the requisite "expectation of payment." [37] His wages were keyed to the hours he worked for USA Waste, and even though Ready Staffing was a conduit, the source of his compensation was USA Waste as well.

Love argues that the existence of an implied contract of employment with USA Waste is belied by USA Waste's express agreement not to hire him or pay him directly. According to Love, USA Waste thereby implicitly acknowledged that it was not his special employer for purposes of the "lent employee" doctrine. We are not persuaded. Under workers' compensation law, the companies' characterization of their temporary staffing arrangement cannot be allowed to override its reality. In *Danek*, for example, the work order containing the agreement between the temporary labor provider and its customer provided specifically that "the persons assigned by Labor Pool are the employees of Labor Pool, and not the employees of Customer." [38] In holding that the customer was nonetheless immune from an injured worker's negligence suit, the Supreme Court of Minnesota reasoned that "[t]he

terms of the work order did not change the legal relationship of the parties since the nature of that relationship must be ascertained not from the label given to it by the parties themselves but from the consequences which the law attached to their arrangements and to their conduct." [39] We must examine the substance and effect of USA Waste's commitments to Ready Staffing. In agreeing not to "hire" Love, USA Waste did not agree to relinquish its control and supervision of his assigned work. As the "special employer," it merely agreed to respect the superior employment rights of Ready Staffing, the "general employer," by adhering to the terms of their contract and only borrowing Love temporarily—without hiring him formally or otherwise interfering with Ready Staffing's rights. Such a promise is entirely consistent with a "lent employee" arrangement.

USA Waste's agreement not to pay Love directly is likewise standard for such an arrangement. "The route of payment is inconsequential in comparison to the question of who originally paid the wages." [40] Thus, in determining the applicability of the "lent employee" doctrine, "[t]he element of who pays the employee shrinks into comparative insignificance . . ., because the net result is almost invar-

---

**36.** *Bliss, supra* note 31, 866 F.Supp. at 1366 (citations omitted).

**37.** "[U]nder our case law, an expectation of payment is a required element of an implied contract." *Union Light, supra* note 1, 796 A.2d at 671 (citation omitted). The District of Columbia Workers' Compensation Act defines the term "employer" to include any entity "using the service of another for pay within the District of Columbia." D.C.Code § 32–1501(10) (2001).

**38.** *Danek, supra* note 31, 252 N.W.2d at 260–61.

**39.** *Id.* at 261. *See also Bliss, supra* note 31, 866 F.Supp. at 1366 n. 8 ("As a general matter, contractual arrangements between temporary services and their client employers are of limited relevance. Workers' compensation coverage is a mandatory statutory duty. Hence the contract between an employer and a temporary service is pertinent only insofar as it changes the fundamental employer-employee relationship, altering statutory obligations in the process.") (citation omitted).

**40.** *Bliss, supra* note 31, 866 F.Supp. at 1365 (citation omitted).

iably that the special employer ultimately pays for the services received and the employee ultimately gets paid." [41]

The fact that Ready Staffing committed to provide Love with workers' compensation coverage similarly does not detract from USA Waste's status as Love's special employer. The economic reality is that "part of the difference between what [USA Waste] paid [Ready Staffing] and what [Ready Staffing] paid [Love] went towards paying [Love's] workmen's compensation premium." [42] If anything, USA Waste's *de facto* payment for Love to receive benefits in lieu of his having to rely on a negligence action argues in favor of its enjoying the immunity of an employer from tort liability.[43]

Love may not have viewed himself as a USA Waste employee; perhaps he thought of himself only as an employee of Ready Staffing. But we agree with the Maryland Court of Appeals that "[t]he parties' subjective belief as to whether an employment relationship exists is not dispositive of the legal question of whether one is the employer of another, except as such belief indicates an assumption of control by the one and submission by the other." [44] Here, to paraphrase *Whitehead,* "the inescapable conclusion is that [Love] voluntarily submitted to [USA Waste's] control." [45]

We therefore hold that under the workers' compensation laws of both Maryland and the District of Columbia, USA Waste was Love's employer and hence was immune from liability to him in tort for his work-related injury. The judgment on appeal must be reversed.

*So Ordered.*

---

41.  Larson § 67.06.

42.  *Maynard, supra* note 31, 626 F.2d at 362 n. 3.

43.  *See, e.g., id.; St. Claire, supra* note 31, 211 F.Supp. at 528.

44.  *Whitehead, supra* note 17, 497 A.2d at 812.

